UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v.-

NEHAD THAHER,

Defendant.

---

17 Cr. 302-3 (KPF)

**ORDER**

KATHERINE POLK FAILLA, District Judge:

Defendant Nehad Thaher, who is currently incarcerated at the Federal Correctional Institution in Elkton, Ohio ("FCI Elkton"), has applied for compassionate release, in the form of immediate release to home confinement, pursuant to 18 U.S.C. § 3582(c)(1)(A). (*See* Dkt. #235, 238, 242, 244, 246, 247).[1] Among other arguments, he contends that he is at an increased risk of contracting, or of having a greater reaction to infection from, the COVID-19 virus because of a pre-existing medical condition and the well-documented inability of Bureau of Prisons ("BOP") personnel at FCI Elkton to control the spread of the virus at that facility. The Government opposes this motion. (Dkt. #240). As set forth in the remainder of this Order, the Court denies Mr. Thaher's motion without prejudice to its reconsideration, while it recommends to the Bureau of Prisons that Mr. Thaher be considered for a furlough.

## BACKGROUND

In May 2017, Mr. Thaher and five others were charged with (i) conspiracy to distribute controlled substances, specifically, smokable synthetic

---

[1] The Court here uses the term "FCI Elkton" to include both the correctional institution and the satellite prison camp.

cannabinoids ("SSCs"), in violation of 21 U.S.C. § 846; and (ii) conspiracy to introduced misbranded drugs into interstate commerce, in violation of 18 U.S.C. § 371. (Dkt. #2). Later that month, a superseding indictment was returned (the "S1 Indictment"), repeating these charges and adding firearms charges against Mr. Thaher and one of his co-defendants. (Dkt. #23).

Based on the evidence submitted over the course of numerous pretrial and pre-sentencing motions, as well as multiple sentencing proceedings, the Court determined that Mr. Thaher was a key member of the charged conspiracy, which itself spanned multiple states and was responsible for the distribution of at least 300 kilograms of mixtures and substances containing synthetic cannabinoids. (Revised Final Presentence Investigation Report ("PSR") ¶¶ 16-35). In particular, Mr. Thaher supervised the manufacturing and distribution of SSCs at a facility in Louisville, Kentucky, and facilitated the distribution of wholesale quantities of SSCs to customers located in Kentucky, Indiana, and Illinois. (*Id.* at ¶ 32). He was in frequent conversation with his co-conspirators regarding all aspects of the conspiracy, including the potency (and the danger) of the products whose manufacturing he oversaw. Mr. Thaher also possessed two firearms that were seized from his home, unloaded, at the time of his arrest. (*Id.* at ¶ 35).

On May 11, 2018, Mr. Thaher pleaded guilty to Count Two of the S1 Indictment pursuant to a plea agreement with the Government. (Dkt. #101 (plea transcript)). The plea agreement was unusual, at least with respect to the parties' stipulations under the United States Sentencing Guidelines ("U.S.S.G"

or "Guidelines"); the parties agreed on certain Guidelines enhancements and listed others as to which there was disagreement. Were the Government's positions on the Guidelines to prevail, Mr. Thaher's Guidelines range, before consideration of the statutory maximum, would be lifetime imprisonment; were the defense's positions to prevail, the otherwise-applicable range would be 135 to 168 months' imprisonment. However, because of the statutory maximum associated with the crime charged in Count Two, the Guidelines range in either case would become 60 months' imprisonment. (PSR ¶ 7).

Mr. Thaher and his co-defendants engaged in extensive pre-sentencing motion practice, both oral and written. (*See, e.g.*, Dkt. #148, 162). Mr. Thaher's sentencing was held on December 12, 2018, at which time the Court sentenced him principally to a term of 60 months' imprisonment. (Dkt. #179 (judgment), 191 (sentencing transcript)).

In resolving the parties' various Guidelines disputes, the Court found in the Government's favor on each. Ultimately, in determining the Guidelines applicable to Mr. Thaher, the Court concluded that: (i) a two-level enhancement applied for his possession of a weapon, pursuant to U.S.S.G. § 2D1.1(b)(1); (ii) a two-level enhancement applied because he made credible threats of violence, pursuant to U.S.S.G. § 2D1.1(b)(2); (iii) a two-level enhancement applied because he maintained a premises for the purpose of manufacturing or distributing a controlled substance (commonly known as a "stash house"), pursuant to U.S.S.G. § 2D1.1(b)(12); (iv) a three-level enhancement applied because Mr. Thaher managed or supervised others and the criminal activity

3

involved five or more participants and was otherwise extensive, pursuant to U.S.S.G. § 3B1.1; and (v) an additional two-level enhancement applied because Mr. Thaher received an aggravating role adjustment under § 3B1.1 and was directly involved in the importation of a controlled substance.

At sentencing, the Court heard argument on whether Mr. Thaher had issued credible threats of violence during the conspiracy. It found that Mr. Thaher had both "the ability and the inclination to inflict violence on others" (Dkt. #191 at 11), as evidenced in conversations recorded in April and May of 2017, where, among other things, Mr. Thaher and a co-defendant discussed hiring a hitman to cripple a confidential informant (*id.* at 13). (*See also id.* at 14 (discussing March 31, 2017 conversation where Mr. Thaher stated, in relevant part, "Give me his address and call me, and I will send someone to shoot him in the legs, and that's it. He will be paralyzed for life.")). On this point, the Court observed:

> With respect to paragraph 44 and the enhancement for making credible threats of violence, I am finding that it is applicable. I have looked with care at the evidence proffered to me by the government, and I believe that there are too many episodes with too much detail and too much granularity for it not to be applicable.
>
> I think this is more than puffery. I think this is more than anger management issues. I am particularly but not exclusively concerned about the direction to a coconspirator to provide certain information to his girlfriend who seems to have gotten or raised the interest of law enforcement, and I am thinking as well about the conversations between Mr. Thaher and Mr. Al Aboudi which to me, just the way they begin and the way they continue, are more than the ravings and rantings but actually a plan.

4

> It is of some significance to me that the government reacted by ending the investigation or by arresting Mr. Al Aboudi in the timeframe that it did.

(*Id.* at 66-67).[2]

More broadly, in explaining its reasons for imposing sentence at the statutory maximum despite the presence of mitigating factors, the Court observed:

> [A]fter thinking about all of the factors in this [case] I find that 60 months is a reasonable sentence for everything that has happened here.
>
> In arriving at that sentence, I have considered the breadth and the scope and the criticality of Mr. Thaher's involvement in the conspiracy. I am considering the fact that he did so with knowledge, repeated episodes of learning of the dangers of these products.
>
> He felt danger. He felt illness himself in [the SSCs'] production, and he heard both about the tester who passed out and individuals who were having adverse reactions to this product.
>
> He was aware of and sought to evade the involvement of law enforcement. And there are threats of violence that to me are too granular, too detailed, and too many not to be significant to me.

(Dkt. #191 at 69-70). The Court also rejected defense efforts to analogize the case to an earlier synthetic cannabinoid case over which it had presided, *United States* v. *Deiban*, No. 15 Cr. 554 (KPF):

> [T]here is a question here about violence or threats of violence that was not present in [*Deiban*]. But in terms of other things, I can analogize only so far, and I find them more different than the same, even though they

---

[2]   The Court rejects Mr. Thaher's current efforts to minimize these conversations as mere "brash talk" (Dkt. #235 at 8), for the same reasons it rejected such arguments during his sentencing.

5

> involved SSCs and they involved resolution pursuant to the misbranding statute. But I am not finding the cases to otherwise be analogous.

(*Id.* at 72).

Mr. Thaher was designated to FCI Elkton; he has served just over 35 months of his 60-month sentence, not accounting for any credit for good behavior. Mr. Thaher filed his counseled motion for compassionate release on May 6, 2020. (Dkt. #235). In it, he noted that he had filed a compassionate release request with the BOP on April 23, 2020, which request was denied on May 4, 2020. (*Id.* at 2). The Government filed its opposition on May 13, 2020, noting its belief that Mr. Thaher had not yet exhausted his administrative remedies, but that the Court could consider his application after 30 days had passed, i.e., on or after May 23, 2020. (Dkt. #240 at 3). Since then, counsel for Mr. Thaher (whose advocacy, it bears noting, is in keeping with the highest traditions of the criminal defense bar) has filed several reply submissions, updating the Court on the spread of COVID-19 at FCI Elkton, and on a related class action lawsuit that was filed in the Northern District of Ohio. (Dkt. #242, 244, 246, 247).

## APPLICABLE LAW

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), a court may reduce a defendant's sentence upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant. A defendant may move under § 3582(c)(1)(A) only after the defendant has "fully exhausted all administrative

rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

When considering an application under § 3582(c)(1)(A), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). In making this determination, the court must consider "the factors set forth in [18 U.S.C. § 3553(a)] to the extent that they are applicable." *Id.* § 3582(c)(1)(A). "The defendant has the burden to show he is entitled to a sentence reduction." *United States* v. *Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)).

Congress has delegated responsibility to the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(t). The Sentencing Commission has determined that a defendant's circumstances meet this standard, *inter alia*, when the defendant is "suffering from a terminal illness" or a "serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," or if, in the judgment of the BOP, the defendant's circumstances are extraordinary and compelling for "other reasons." U.S.S.G. § 1B1.13(1)(A) & Application Note 1(A), (D). Following the passage of the First Step Act, courts

7

may independently determine whether such "other reasons" are present in a given case, without deference to the determination made by the BOP. *See United States* v. *Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020). In addition, the Sentencing Commission counsels that a court should reduce a defendant's sentence only after determining that "[t]he defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

## DISCUSSION

Both parties agree that Mr. Thaher's motion is now properly before the Court. The issue at hand is whether Mr. Thaher has identified "extraordinary and compelling reasons" warranting his release. At this time, the Court believes that Mr. Thaher's release to home confinement would not be appropriate, and that the better course of action is a temporary furlough until conditions at FCI Elkton have improved.

Mr. Thaher asks the Court to consider his post-offense rehabilitation, and cites in that regard his work at the food service programs at FCI Elkton and the Metropolitan Detention Center; his decision to take advantage of prison educational programs; and his clean disciplinary history. (*See, e.g.*, Dkt. #242 at 6). The Court is, of course, pleased to learn of Mr. Thaher's efforts to better himself while incarcerated and of his creditable disciplinary record. But these developments, however commendable, do not warrant the extraordinary relief of compassionate release. *See* U.S.S.G. § 1B1.13, n.3 ("rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason"). Mr.

Thaher recognizes as much, asking the Court to consider rehabilitation "in combination" with his low recidivism risk, his pre-existing medical conditions, and his conditions of confinement at FCI Elkton. (Dkt. #242 at 6). The Court focuses on the latter two arguments.

Mr. Thaher argues that the conditions of his incarceration at FCI Elkton place him at a higher risk of contracting COVID-19 (or of having a more severe reaction if it was contracted), because of the nature of his confinement at the facility, his pre-existing medical condition, and, most significantly, the seeming inability of FCI Elkton prison staff to handle the outbreak. The Court recognizes, as do the parties, that sister courts in this District have granted, and denied, compassionate release motions based on the existence of the COVID-19 pandemic and the risks of its transmission at prisons. *See generally United States* v. *Morrison*, No. 16 Cr. 551-1 (KPF), 2020 WL 2555332, at *2 (S.D.N.Y. May 20, 2020); *see also United States* v. *Kerrigan*, No. 16 Cr. 576 (JFK), 2020 WL 2488269, at *3 (S.D.N.Y. May 14, 2020) (collecting cases). This Court aligns itself with those courts that have found "that the risks posed by the pandemic alone do not constitute extraordinary and compelling reasons for release, absent additional factors such as advanced age or serious underlying health conditions that place a defendant at greater risk of negative complications from the disease." *United States* v. *Nwankwo*, No. 12 Cr. 31 (VM), 2020 WL 2490044, at *1-2 (S.D.N.Y. May 14, 2020) (collecting cases); *see also United States* v. *Brady*, No. 18 Cr. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020) ("Instead, compassionate release motions amid the

9

COVID-19 pandemic have required a 'fact-intensive' inquiry, made in the 'unique circumstances' and 'context' of each individual defendant.  In practice, courts in this district have considered the age of the prisoner; the severity and documented history of the defendant's health conditions, as well as the defendant's history of managing those conditions in prison; the proliferation and status of infections in the prison facility; the proportion of the term of incarceration that has been served by the prisoner; and the sentencing factors in 18 U.S.C. § 3553(a), with particular emphasis on the seriousness of the offense, the deterrent effect of the punishment, and the need to protect the public." (internal citations omitted)).

Mr. Thaher's proffered medical issue does not suffice to constitute an extraordinary and compelling circumstance.  Mr. Thaher is 35 years old, which would otherwise place him at a comparatively low risk of hospitalization or death from COVID-19.  *See* Weekly Updates by Select Demographic and Geographic Characteristics, CENTER FOR DISEASE CONTROL, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex (accessed June 8, 2020).  And while Mr. Thaher cites his elevated cholesterol level as "an additional cause for concern" (Dkt. #235 at 7 and Ex. F), he does not suggest that he or the BOP has been unable to manage this condition.  *See, e.g.*, *Brady*, 2020 WL 2512100, at *3-4 (acknowledging serious nature of defendant's medical conditions but denying compassionate release where conditions stable and managed in BOP facility); *United States* v. *Garcia*, No. 18 Cr. 802, 2020 WL 2468091, at *5-6 (S.D.N.Y. May 13, 2020) (denying

compassionate release to defendant with asthma, hypertension, and heart conditions housed in facility with 40 documented cases of virus).

But the Court cannot focus on Mr. Thaher's medical conditions in isolation. It must consider them, as other district courts have, in the context of his confinement at FCI Elkton, and it is this argument that is his strongest. The current conditions of confinement at FCI Elkton have been the subject of numerous press articles and a class action lawsuit. *See, e.g.*, "National law enforcement leaders urge the release, transfer of inmates at federal prison in Ohio," *Cleveland Plain Dealer* (accessed June 4, 2020). According to the information maintained by the BOP, 446 inmates and 7 staff members are listed as currently "positive" for the COVID-19 virus; 9 inmates have died from the virus; and 153 inmates and 46 staff members are listed as having "recovered" from the virus. *See* https://www.bop.gov/coronavirus/ (accessed June 8, 2020). The degree and speed of transmission of the virus at FCI Elkton has dwarfed other BOP facilities, which suggests that, however well-thought-out, the BOP's COVID-19 Modified Operations Plan is simply not working at FCI Elkton.

In April 2020, several inmates with serious medical conditions (collectively, "Petitioners") filed a class action habeas petition under 28 U.S.C. § 2241 in the Northern District of Ohio, seeking release based on FCI Elkton's inability to implement medically-indicated social distancing and hygiene protocols. *See generally Wilson* v. *Williams*, No. 4:20 Civ. 00794 (JG) (N.D.

11

Ohio) ("*Wilson*").  The *Wilson* Petitioners clarified at the outset the relief they sought:

> The term "release," as used throughout this Petition, refers to discharge of incarcerated persons from the physical confines of Elkton, not necessarily release from custody.  Release options may include, but are not limited to: release to parole or community supervision; transfer furlough (as to another facility, hospital, or halfway house); or non-transfer furlough, which could entail a released person's eventual return to Elkton once the pandemic is over and the viral health threat is abated.  Any releases would include requirements for testing, care, and social distancing, as informed by a public health expert.

(*Wilson*, Dkt. #1 at n.2).  On April 22, 2020, the district court granted in part and denied in part Petitioners' request for a preliminary injunction; it ordered the respondents in that case ("Respondents") to identify "medically vulnerable subclass members"[3] within one week, and then to "to evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough" within two weeks.  (*Wilson*, Dkt. #22 at 20).  Judge Gwin further ordered that those subclass members deemed

---

[3] United States District Judge James S. Gwin defined the subclass to include:

> [A]ll Elkton inmates 65 years or older and those with documented, pre-existing medical conditions, including heart, lung, kidney, and liver conditions, diabetes, conditions causing a person to be immunocompromised (including, but not limited to cancer treatment, transplants, HIV or AIDS, or the use of immune weakening medications), and severe obesity (body mass index of 40 or higher).  The subclass definition excludes those whose only risk factor is a history of smoking, given the difficulty of documenting such occurrence and identifying those individuals through BOP records alone.

(*Wilson*, Dkt. #22 at 12).  Mr. Thaher does not fall within the defined subclass.

by the BOP to be "ineligible for compassionate release, home release, or parole or community supervision … be transferred to another BOP facility where appropriate measures, such as testing and single-cell placement, or social distancing, may be accomplished." (*Id.* at 20-21).

Respondents appealed the injunction to the Sixth Circuit Court of Appeals on April 27, 2020 (*Wilson*, Dkt. #26), which denied Respondents' request for a stay (*id.*, Dkt. #38, 46). Respondents then applied for a stay to the Supreme Court of the United States, which denied the application on May 26, 2020. The litigation is ongoing, with recent docket entries including an order to enforce the preliminary injunction (*id.*, Dkt. #85); a second appeal to the Sixth Circuit (*id.*, Dkt. #95); and a second denial by that Court of Appeals of Respondents' stay motion (*id.*, Dkt. #107).

A strong argument can be made that, for many members of the medically vulnerable subclass identified in *Wilson*, extraordinary and compelling circumstances exist under § 3582(c)(1)(A)(i). Judge Gwin appears to have recognized as much, in granting injunctive relief to that subclass and in mandating their transfer to "other means of confinement" (Dkt. #22 at 19), including "compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough" (*id.* at 20). The issue here, however, is whether these same factors constitute extraordinary and compelling circumstances for other FCI Elkton inmates, like Mr. Thaher, who are *not* members of the subclass. For this Court, that is a bridge too far.

13

To begin, in light of the failure of BOP efforts to stay Judge Gwin's decisions, the transfer process contemplated by his orders should be implemented in the near term. Respondents in the *Wilson* case have so far identified 837 inmates — approximately one-third of the prison population at Elkton — as putative members of the medically vulnerable subclass; it is significant to the Court that Mr. Thaher has not made that list. (*Wilson*, Dkt. #85 at 4). The transfer of these inmates, under Judge Gwin's watchful eye, will go a long way toward promoting the social distancing and other public health measures necessary to protect the safety of those inmates who remain. Conversely, the Court is unwilling to say that the fact of Mr. Thaher's incarceration at FCI Elkton — considered alone or in combination with his high cholesterol, his post-offense rehabilitation, or his low recidivism score — suffices to warrant immediate release to home confinement.[4]

Even if the Court were to find extraordinary and compelling circumstances on this record, the factors set forth in 18 U.S.C. § 3553(a) counsel against granting Mr. Thaher's motion. Those factors include "the

---

[4] Counsel for Mr. Thaher brought to the Court's attention a May 19, 2020 order in the *Wilson* case (*Wilson*, Dkt. #85), in which Judge Gwin appears to order Respondents to make broad use of the BOP's home confinement authority, including a directive that they "grant home confinement to inmates who were previously deemed ineligible solely on the basis of a Low PATTERN risk score" (*id.* at 7). (Dkt. #244 at 2). As an initial matter, it is unclear to this Court whether the "inmates" to whom the order refers extend beyond the medically vulnerable subclass on which Judge Gwin's previous orders have focused; indeed, the order begins by reciting the procedural history that resulted in the identification of the subclass, and its caption makes clear that it resolves a motion brought by Petitioners, members of the subclass, to enforce the court's prior injunctive order. To the extent that Judge Gwin is directing Respondents to grant home confinement to a wider swath of inmates, he would be granting relief beyond that sought in the petition. This Court does not see a basis in the *Wilson* record for such a grant.

nature and circumstances of the offense and the history and characteristics of the defendant," as well as the need "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(C). As discussed above, Mr. Thaher played a critical role in a wide-ranging conspiracy that distributed enormous quantities of synthetic cannabinoids to multiple states, including New York. Unlike some defendants in cases of this type, Mr. Thaher was aware of the deleterious health consequences of the products he was distributing. And, most disturbingly to the Court, Mr. Thaher contemplated and planned acts of violence to promote and preserve the conspiracy, even if these acts did not come to fruition. Mr. Thaher benefitted from a guilty plea that capped his sentence at 60 months; the Court intended him to serve the totality of that sentence. *Cf. United States* v. *Schultz*, No. 17 Cr. 193S, 2020 WL 2764193, at *7 (W.D.N.Y. May 28, 2020) (concluding that inmate with severe asthma housed at FCI Elkton demonstrated "extraordinary and compelling reasons" warranting a sentencing reduction, but denying compassionate release request based on analysis of § 3553(a) factors).

Even this, however, is not the end of the analysis. The Court understands from counsel for Mr. Thaher that the BOP has previously denied his requests to that agency for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), and for home confinement as contemplated in the CARES Act, Pub. L. No. 116-136 (2020), and the Attorney General's April 3, 2020 memorandum. There remains the possibility of furlough pursuant to 18 U.S.C. § 3622, which provides in relevant part that:

15

> The Bureau of Prisons may release a prisoner from the place of his imprisonment for a limited period if such release appears to be consistent with the purpose for which the sentence was imposed and any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2), if such release otherwise appears to be consistent with the public interest and if there is reasonable cause to believe that a prisoner will honor the trust to be imposed in him, by authorizing him, under prescribed conditions, to —
>
> (a) visit a designated place for a period not to exceed thirty days, and then return to the same or another facility, for the purpose of —
>
> ***
>
> (3) obtaining medical treatment not otherwise available;
>
> ***
>
> or
>
> (6) engaging in any other significant activity consistent with the public interest.

18 U.S.C. § 3622. This Court concurs with the analysis of the furlough statute that was ably provided by Judge Furman in *United States* v. *Roberts*, No. 18 Cr. 528-5 (JMF), 2020 WL 1700032 (S.D.N.Y. Apr. 8, 2020). In particular, the Court agrees that (i) "[e]ither of the highlighted subsections may well be sufficient to justify [Mr. Thaher's] temporary release under the circumstances"; (ii) "such release can be extended beyond the thirty days" provided in the statute; (iii) "the decision of whether to grant … a furlough under Section 3622 is committed to sole discretion of the BOP"; and (iv) "nothing in Section 3622 'prevents this Court from recommending' that BOP exercise its discretion to grant [Mr. Thaher's] temporary release." *Id.* at *3-4 (internal citation omitted)).

The Court makes that recommendation here. Based on all of the circumstances discussed in this Order, and focusing in particular on the rampant spread of COVID-19 at FCI Elkton, the Court believes the wisest, fairest course of action with respect to Mr. Thaher is temporary release pursuant to 18 U.S.C. § 3622. The Court is unclear on the issue of whether such an application has been submitted on his behalf. If it has not, the Court encourages defense counsel to file such an application and advise the Court of the date of its filing. If and when a furlough application is filed on Mr. Thaher's behalf, the Court ORDERS that the BOP resolve that application within 21 days of its submission. If the BOP denies the application, Mr. Thaher may request that this Court reconsider his application for compassionate release. On the unusual facts of this case, the Court extends the time for reconsideration specified in Local Criminal Rule 49.1(d) to seven days after any BOP denial of a furlough application.

## CONCLUSION

For the foregoing reasons, Defendant Nehad Thaher's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is DENIED. The Clerk of Court is directed to terminate the motions at docket entries 235, 238, 242, 244, 246, and 247.

SO ORDERED.

Dated: June 8, 2020
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge